UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RICHARD CHYLINSKI                   :
                                    :
                                    :
v.                                  :      CIV. NO. 3:08CV322 (JCH)
                                    :
                                    :
BANK OF AMERICA, N.A.               :
                                    :
                                    :

RECOMMENDED RULING ON MOTION FOR SUMMARY JUDGMENT

Plaintiff, Richard Chylinski, brought this action, pro se, against his former employer, Bank of America, N.A. ("BOA"), alleging that the Bank of America discriminated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. ("Title VII"), by sexually harassing and retaliating against him.[1]

For the reasons that follow, BOA's Motion for Summary Judgment **[Doc. #196]** is **GRANTED.**

_____

[1]All other allegations were dismissed by Judge Hall in two rulings on motions to dismiss. [Doc. ##44, 75].  In opposition to summary judgment, plaintiff appears to raise several claims that are not part of his Complaint and/or have not been previously raised during the litigation.  See Doc. #125 at 1-2 (violation of Conn. Gen. Stat. §§46a-58(a), 46a60(a)(1), Sec. 31-51q, Cal. Code §12940(j)(3)); at 2 (intentional infliction of emotional distress); at 7-8, 12-16 (sexual harassment by Mark Leonard); at 16-17 (intentional interference with a contract); at 11, 21 (sexual harassment by Donna Spicer).  These claims are not properly before the Court and will not be addressed.

1

STANDARD OF LAW

The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, see Celotex Corp. v. Catrett, 477 U.S. 317, 323-25 (1986), and the Court must resolve all ambiguities and draw all inferences in favor of the non-movant. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986); Holcomb v. Iona College, 521 F.3d 130, 137 (2d Cir. 2008). If the moving party carries its burden, the party opposing summary judgment "may not rely merely on allegations or denials." Fed. R. Civ. P. 56(e)(2). Rather, the opposing party must "set out specific facts showing a genuine issue for trial." Id. In short, the nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Anderson, 477 U.S. at 249-50 (citations omitted).  A party may not create a genuine issue of material fact simply by presenting contradictory or unsupported statements. See SEC v. Research Automation Corp., 585 F.2d 31, 33 (2d Cir. 1978). Nor may he rest on "allegations or denials" contained in his pleadings. Goenaga v. March of Dimes Birth Defects Found., 51 F.3d 14, 18 (2d Cir. 1995). A self-serving affidavit that simply reiterates the conclusory allegations of the complaint without other support is insufficient to raise a genuine issue of material fact. See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 888 (1990).

2

Courts must be "particularly cautious about granting summary judgment to an employer in a discrimination case when the employer's intent is in question. Because direct evidence of an employer's discriminatory intent will rarely be found, 'affidavits and depositions must be carefully scrutinized for circumstantial proof which, if believed, would show discrimination.' " Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir. 1997) (citations omitted) (quoting Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994)). However, "[s]ummary judgment is appropriate even in discrimination cases," Weinstock v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000), where a plaintiff's argument is "based on conclusory allegations of discrimination and the employer provides a legitimate rationale for its conduct, . . ." Tojzan v. N.Y. Presbyterian Hosp., No. 00 Civ. 6105(WHP), 2003 WL 1738993, at *4 (S.D.N.Y. March 31, 2003).

Finally, the Second Circuit has recognized that even in fact-specific discrimination cases, summary judgment may be appropriate. Abo-Brisson v. Delta Airlines, Inc., 239 F.3d 456, 466 (2d Cir. 2001). The advantageous purpose of summary judgment - to avoid "protracted, expensive and harassing trials" based upon factually unsupported claims - is at least as relevant in the context of discrimination cases as those involving other ultimate questions of fact, and discrimination claims should not be barred from summary judgment to achieve those ends. Id.; see Celotex, 477 U.S. at 323-24.

3

FINDINGS OF FACT

Based on defendant's Local Rule 56(a)(1) Statement, plaintiff's Local Rule 56(a)(2) Statement, summary judgment briefs, and the exhibits provided, the following facts are undisputed.[2]

1.  Plaintiff Richard Chylinski was an employee of Adecco Staffing, a temporary agency that provided contract employees to the BOA.[3]  Doc. #96-3; Def. 56(a)(1) Stat. ¶1.

2.  During the summer of 2005, Chylinski began a temporary assignment with BOA in the Consumer Loan Department at the Farmington Home Equity Group, located in Farmington,

---

[2] Local Rule 56(a)(2) states in part, "The papers opposing a motion for summary judgment shall include a document entitled "Local Rule 56(a)(2) Statement," which states in separately numbered paragraphs meeting the requirements of Local Rule 56(a)(3) and corresponding to the paragraphs contained in the moving party's Local Rule 56(a)(1) Statement whether each of the facts asserted by the moving party is admitted or denied."

Plaintiff did not file his Local Rule 56(a)(2) Statement with his opposition brief on December 4, 2009. Rather, he filed his  Local Rule 56(a)(2) Statement on December 28, 2009. [Doc. #130].  His Local Rule 56(a)(2) Statement does not comply with the "specific citation" obligation of Local Rule 56(a)(3) and does not "admit or deny" by corresponding paragraph to defendant's Local Rule 56(a)(1) Statement.  Local Rule 56(a)(3) states, "failure to provide specific citations to evidence in the record as required by this Local Rule may result in the Court deeming certain facts that are supported by the evidence . . . ." The Court will carefully consider all the evidence provided with these rules in mind.  Defendant has filed two Motions to Strike [Doc. ##126, 132], addressing plaintiff's failure to file his opposition to summary judgment and Local Rule 56(a)(2) Statement in a timely manner and addressing the insufficiency of his pleadings.  The Court has carefully noted defendant's objections in making the following findings of undisputed facts.

[3] Plaintiff, who was born on May 4, 1976, was 29 in the summer of 2005.  Doc. #96-3; Def. 56(a)(1) Stat. ¶1.

Connecticut.  Id. at ¶2. His duties involved processing Bank documents, home loans and home lines of credit and viewing mortgage applications. Id.

3.   On August 22, 2005, Chylinski was offered a full-time permanent position with BOA as a MLO-Loan Closer, reporting to the Unit Leader, Theresa DeAngelo. Id. at ¶3.

4.   In October 2005, Chylinski transferred to Unit Leader Mark Leonard's department. Id. at ¶4. Chylinski's title changed to Production Specialist I, but his responsibilities essentially remained the same. Id. His primary responsibility was ensuring that information required to produce complete loan documents was input into BOA's ACAPS loan system on a timely and accurate basis to support the scheduled loan closing. Id.

5.   Leonard supervised a group of associates including Bianca Bingham, who was in her early twenties. Id. at ¶5. Bingham was a temporary employee from Adecco Staffing who had no supervisory authority. Id.

Chylinski Overhears Bingham's Conversations

6.   Chylinski's work station was located next to Bingham's. Id. at ¶6. Despite trying to "tune [the conversations] out," Chylinski would sometimes overhear Bingham use the name "Richard" during her conversations and would assume that she was referring to him. Id.

7.   On December 1, 2005, Chylinski emailed Bingham and asked her if she would ask Leonard to move Chylinski's seat elsewhere.

5

Id. at ¶7.  Chylinski testified that since he found
Bingham's behavior unacceptable, moving his workstation
would resolve his concerns.  Id.  Bingham was unresponsive
to his email.  Id.

8.  Chylinski testified that on or about December 5, 2005,
Bingham said to a group of associates, "it's about time that
Richard sticks his thing in my chocolate."  Id. at ¶8; [doc.
#96, pl. inter. resp. no. 15 (Dec. 5, 2005), inter. resp.
no. 17 ("Plaintiff was subjected to unwanted sexual
innuendos and unwanted actions by the alleged harasser, Ms.
Bingham, beginning in early December 2005 through February
2006."].  Other than this comment, which was not said
directly to Chylinski, Chylinski cannot recall any other
instances of sexually explicit comments made by Bingham
about him or to him.  Id.

9.  Defendant has a clear policy against harassment, retaliation
and discrimination. Id. at ¶9.  Chylinski never raised any
concerns of sexual harassment to Human Resources.  Id.

10.  During this time period, Chylinski also began complaining to
Leonard about Bingham's space heater and requesting that his
workstation to moved to another location within the
facility.  Id. at ¶10.  Leonard advised him that moving to a
different work station simply because of a space heater was
not an option, and Chylinski was repeatedly asked to help
management understand if he had any other issues with
Bingham.  Id, Chylinski was never able to articulate his

6

concerns in a manner that was clear and understandable.   <u>Id.</u>

<u>Management's Response</u>

11.   On December 8, 2005, Chylinski emailed Leonard requesting a
meeting to discuss "the issue." <u>Id.</u> at ¶11. Chylinski also
emailed Bingham asking her availability to meet with him and
Leonard over lunch.   <u>Id.</u>  Neither email provides additional
information about the alleged issue that was troubling
Chylinski.   <u>Id.</u>

12.   Chylinski testified that on December 8, 2005, he allegedly
met with Leonard concerning Bingham's space heater and the
alleged sexual harassment and requested that either his or
Bingham's work station be moved.   <u>Id.</u> at ¶12.  Leonard does
not recall Chylinski referring to sexual harassment. <u>Id.</u>
Instead, Chylinski drew diagrams on a dry-erase board,
repeatedly suggested that they go to lunch or coffee in
order to discuss his concerns and stated that the only way
to resolve his concerns was for Bingham to be included in
the conversations.   <u>Id.</u>  When Leonard agreed to have Bingham
participate in the meeting, Chylinski proceeded to ask
Bingham what her issues were with him. <u>Id.</u>  When Leonard
attempted to refocus the meeting, and asked him to explain
his concerns, Chylinski commented, "are you fucking
kidding?"  Chylinski was given verbal counseling for his
inappropriate behavior.   <u>Id.</u>

13.   On December 9, 2005, Chylinski sent an email to Leonard
asking about the possibilities of being transferred

elsewhere. Id. at ¶13.  Chylinski testified that Leonard was not addressing the issue quickly enough, and he requested a follow-up meeting.  Id.  This time, Chylinski asked Donna Spicer, another Unit Leader, to attend a meeting with Leonard.  Id.  It was during this meeting that Chylinski raised general concerns about Bingham.  Id.  Spicer advised Chylinski to prepare a letter specifically outlining his concerns so that management could address the matter appropriately.  Id.

14.  Later that same day, Chylinski emailed Spicer and Leonard a list of broad and unsupported allegations about Bingham. Id. at ¶14.  This was the first time that Leonard, or anyone else in management, was made aware of Chylinski's allegations of sexual harassment by Bingham. Id.

15.  Upon receipt of the email, Leonard contacted the human resources department and spoke also with Beverly Haynes, Fulfillment Unit Leader. Id. at ¶15.  On Monday, December 12, 2005, a meeting was held among Chylinski, Leonard, Spicer and Haynes to discuss Chylinski's newly disclosed allegations.  Id.  Chylinski did not provide any specific information to support his allegations of "threatening language" "obscene, abusive language," "sexual innuendos" and "excessive disturbance."  Id.  Instead, he said he overheard conversations between Bingham and other associates that were not directed at him.  Id.  Chylinski was advised that BOA would investigate his allegations of sexual

8

harassment and that he should refrain from discussing the matter with others in the Bank. <u>Id.</u> Chylinski again asked if he could transfer elsewhere in the facility, and management agreed to move him to Spicer's department and away from Bingham. <u>Id.</u> Chylinski continued to perform the same responsibilities as a direct report to Leonard, just from a different location within the facility. <u>Id.</u>

16. Of note, Chylinski never provided details of the alleged sexual harassment, sexual innuendos or obscene or threatening language during the meeting. <u>Id.</u> at ¶16. He also never told management that he overheard Bingham say, "it's about time that Richard sticks his thing in my chocolate." <u>Id.</u>

17. The Bank's investigation did not support Chylinski's vague suggestions of sexual harassment. <u>Id.</u> at ¶17. However, the Bank met with Bingham and verbally counseled her regarding appropriate workplace behaviors. <u>Id.</u>

<u>Subsequent Contact with Bingham</u>

18. After the move to Spicer's department on or about December 12, 2005, Chylinski admitted that he did not have any further communications with Bingham. <u>Id.</u> at ¶18. While Bingham would visit Spicer's department, it was only to speak with associates other than Chylinski. <u>Id.</u> Chylinski testified that after he noticed Bingham staring and/or leering at him when she entered Spicer's department, he advised Spicer and Leonard. <u>Id.</u> Leonard notified Chylinski

that he would speak with Bingham and advise her to refrain from going near Chylinski.  Id.  Leonard did, in fact, speak with Bingham, who stated that visits to Spicer's department were out of business necessity. Id.

19. Bingham's assignment terminated in February 2006, and she left the Bank's employment.  Id.

Inappropriate Communication/Behavior

20. Chylinski admitted that, on numerous occasions, Leonard advised him that he was being insubordinate by going outside the chain of command to report concerns that could be addressed with Leonard directly.  Id. at ¶20. For example, on January 20, 2006, Chylinski emailed Brenda Wilson, an administrative assistant, concerning his "issues" and advised her that he would report back to her after his meeting with Leonard.  Id.  Wilson responded that she was an administrative assistant and had no authority.  Id.

21. Chylinski testified that, soon after his initial move to Spicer's workstation, he wanted to move away from Spicer. Id. at ¶21.  According to Chylinski, he wanted a transfer not because of any alleged sexual harassment by Spicer, but because Spicer was one of the managers with whom Chylinski had initially consulted about Bingham's alleged sexual harassment.  Id.

22. With respect to his request for a transfer, Chylinski testified:

> I followed up with Beverly Haynes in

10

> February, I followed up in March, I followed
> up again with two other members of
> management, and I understood that if there
> was a change this is to be handled by Mr.
> Leonard. I approached other individuals at
> the Bank such as Larry, the moving guy, who's
> in charge of moving associates work stations,
> and he did not hear of a requested move for
> myself.  But eventually after addressing the
> issue in May with Beverly Haynes, she
> mentioned that Mark Leonard was working on
> the issue and you should be moved shortly.

Id. at ¶22.

23.  On March 17, 2006, Chylinski sent an email to Leonard,

     asking for a meeting with Karen Spagna, Senior Vice

     President, Business Operations Executive, to address his

     "uncomfortable cubicle" and "unproductive space."  Id. at

     ¶23.  Chylinski claimed that since he is a larger person

     with long hands, he needed a different keyboard and desk

     space.  Id.  He also wanted to be away from the fax machine

     and copier.  Id.  Chylinski further notified Leonard that he

     had been consulting with "Dave from PCR" about his move

     despite Leonard's repeated instructions not to speak with

     others outside the team.  Id.

24.  Leonard replied to Chylinski by email later in the day,

     letting him know that they could discuss the move when

     Leonard returned to the office.  Id. at ¶23.  Leonard again

     reminded Chylinski not to approach anyone else about his

     request to move his workstation.  Id.

25.  On April 18, 2006, Leonard sent Chylinski an email

     concerning the seat change.  Id. at ¶25.  Leonard wanted to

11

confirm that Chylinski did want to move back to the seat he
occupied before moving to Spicer's department, despite its
location adjacent to a copy machine.  Id.  Leonard advised
Chylinski that it had both the keyboard tray and the
additional room that Chylinski requested.  Id.  Chylinski
does not recall if he ever responded to Leonard's email.
Id.

26.  On May 16, 2006, Leonard sent another email to Chylinski,
     reminding him, yet again, that he should refrain from making
     inquiries to other associates in other departments
     concerning his move. Id. at ¶26.  Leonard advised Chylinski
     that the request was made on May 4 and that there was a
     process in place to ensure that the move happened
     effectively.  Doc. #96-3; Def. 56(a)(1) Stat. ¶26. "It is
     not your role to push these situations or associates along
     in order to fit your time schedule." Id. Ignoring Leonard's
     instructions, Chylinski replied that he spoke with "Larry
     who is part of the department that oversees desk moves" and
     Larry explained the process to Chylinski. Doc. #96-3; Def.
     56(a)(1) Stat. ¶26.  Leonard responded, "I'll remind you
     that even though you requested to have your seat moved, that
     does not mean it will automatically happen. There was much
     to consider in this process before your request would be
     approved . . .  All I want to say is that there is no need
     to approach anyone from other departments to follow up on my
     actions . . . ." [Chylinski Depo. Ex. 18].

27. On or about May 17, 2006, Chylinski moved back to Leonard's
    department. Doc. #96-3; Def. 56(a)(1) Stat. ¶27.

Tardiness

28. In addition to issues of insubordination, Chylinski admitted
    that Leonard counseled him about his attendance and
    tardiness. Id. at ¶28. Chylinski lived very near the
    Farmington facility, yet was unable to arrive to work on
    time. Id. In an effort to help him be successful, Leonard
    agreed to change Chylinski's schedule so that he could start
    work at 9:00 a.m. instead of his original start time of 8:30
    a.m. Id.

29. Chylinski received a final written counseling for tardiness
    on May 24, 2006 it stated that he had received verbal
    counseling on March 24, 2006 and April 14, 2006, regarding
    attendance/tardiness. Since that time, Chylinski had been
    late an additional five times, "even though [his] work
    schedule was adjusted from 8:30am-5:00pm to 9:00am-5:30pm.
    Chylinski was tardy on ten occasions from January 1 to May
    24, 2006. [Chylinski Depo. Tr. Ex. 21]; see also Doc. #96-
    3; Def. 56(a)(1) Stat. ¶30.

30. The warning specifically noted that, since February 2006,
    Chylinski had been late ten (10) times and had been
    counseled at least twice. Id.

Termination of Employment

31.  On the same day, Leonard also administered a final written
     warning concerning Inappropriate Communications/Behavior.
     Id. at ¶31.  The warning specifically stated that Chylinski
     had been counseled about his inappropriate communications on
     three different occasions yet he continued to engage in
     unprofessional communications with management, colleagues
     and contractors and had become a disruption in the
     workplace. Id.  Chylinski was further counseled that if he
     had any concerns, he could raise them with his manager or
     human resources, not various associates in different
     departments.  Id.

32.  Immediately after leaving the meeting with Leonard where he
     received the warning, Chylinski sent a cryptic email to
     DeAngelo asking her to arrange a meeting with him, Haynes
     and Spagna. Id. at ¶32.  Chylinski provided no information
     as to the purpose of the meeting.  Id.

33.  Not more than one hour after sending the first email to
     DeAngelo, Chylinski sent a second vague email to Spicer and
     Haynes stating:

          As we discussed this issue with TL Mark
          Leonard and myself. I would like your
          response to the question in order to clarify
          this issue.  PLEASE SEE A MEMBER OF
          MANAGEMENT TO ADDRESS THIS ISSUE/OR MYSELF.

          Any suggestions/questions?

Id. at ¶33 (emphasis in original).

34.  On May 24, 2006, upon learning of Chylinski's apparent

14

failure to follow his instructions and after consulting with human resources, Leonard terminated Chylinski's employment for insubordination, namely, sending emails to two managers outside his reporting structure even after being given a final written warning admonishing him for such conduct.  Id. at ¶34.


DISCUSSION

Plaintiff alleges that the Bank of America discriminated against him in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §2000e et seq. ("Title VII"), alleging it maintained a hostile work environment and retaliated against him based on a protected activity.[4]

Title VII: Hostile Work Environment Claim

A hostile work environment exists in violation of Title VII when the workplace is permeated with discriminatory intimidation, ridicule and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment. Harris v. Fork Lift Sys., Inc., 510 U.S. 17, 21-22 (1993). "To prevail on a hostile work environment claim, plaintiff must show both '(1) that his workplace was permeated with discriminatory intimidation that was sufficiently severe or pervasive to alter the condition of his employment, and

---

[4]In Count One of the First Amended Complaint, plaintiff alleges a hostile work environment based on his sex. In Count Two, plaintiff alleges retaliation.  All other claims were dismissed on April 15, 2009, by Judge Hall. See Doc. #75.

(2) that a specific basis exists for imputing to the employer the conduct that created the hostile environment.'" Briones v. Runyon, 101 F.3d 287, 291 (2d Cir. 1996) (quoting Van Zant v. KLM Royal Dutch Airlines, 80 F.3d 708 (2d Cir. 1996). "Additionally, because the alleged harassment is attributable to a co-worker and not a supervisor, [Chylinski] must demonstrate that the [Bank] 'either provided no reasonable avenue for complaint or knew of the harassment but did nothing about it.'" Id. (quoting Van Zant, 80 F.3d at 715). Relevant factors include the (1) frequency of the discriminatory conduct, (2) the severity of the conduct, (3) whether it is physically threatening or merely an offensive utterance, and (4) whether it unreasonably interferes with an employee's work performance. Harris, 510 U.S. at 23.

"The sufficiency of a hostile work environment claim is subject to both subjective and objective measurement: the plaintiff must demonstrate that [he] personally considered the environment hostile, and that the environment rose to some objective level of hostility." Leibovitz v. New York City Transit Auth., 252 F.3d 179, 188 (2d Cir. 2001) (citations omitted).

Isolated remarks or occasional episodes of harassment will not merit relief under Title VII; the incidents of harassment must occur in concert or with a regularity that can reasonably be termed pervasive. See Petrosino v. Bell Atlantic, 385 F.3d 210, 223 (2d Cir. 2004) ("we are mindful that Title VII does not establish a 'general civility code' for the American workplace."). However, one act that is sufficiently severe may

16

alter the plaintiff's conditions of employment without repetition. Quinn v. Green Tree Credit Corp., 159 F.3d 759, 768 (2d Cir. 1998), abrogated on other grounds, Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101 (2002).

A plaintiff claiming gender-motivated hostility under Title VII must demonstrate that the conduct took place because of his gender. See Alfano v. Costello, 294 F.3d 365, 374 (2d Cir. 2002) (holding that it is "axiomatic" that plaintiff's claim of a hostile work environment based on his sex must show conduct took place because of his sex).

Chylinski's hostile work environment claim is based on one comment allegedly made by Bingham to fellow associates[5] and Bingham's allegedly crude telephone conversations with her friends. [6]   Additionally, Chylinski alleges that, after his workstation was moved, Bingham would enter his department and stare or leer at him.[7]  Chylinski testified that after December

_____

[5]Chylinski testified that on or about December 5, 2005, Bingham said to a group of associates, "its about time that Richard sticks his thing in my chocolate." [Chylinski Depo. Tr. at 69]. Other than this comment, which was not said directly to Chylinski, Chylinski cannot recall any other instances of sexually explicit comments made by Bingham about him or to him. [Chylinski Depo Tr. at 70; Pl. Answ. Interrog. No. 15].

[6]Chylinski testified that he would often overhear Bingham on the phone with her friends discussing "bodies and breasts" [Chylinski Depo. Tr. at 68], and despite trying to "tune [the conversations] out," Chylinski would sometimes overhear Bingham use his first name "Richard" during her conversations and would assume that she was referring to him. [Chylinski Depo Tr. at 65-67].

[7]Chylinski testified that after he noticed Bingham staring and/or leering at him when she entered Chylinski's new

12, 2005, when his workstation was moved to a new department, all communications ceased with Bingham. [Bingham Depo. Tr. at 118]. Bingham's assignment terminated in February or March 2006, and she left the Bank's employment. [Chylinsi Depo. Tr. at 121].

The Court finds that Bingham's alleged comment to her co-workers, standing alone, is insufficient to create a hostile work environment. The comment was not directed to Chylinski, but was made to Bingham's co-workers and the reference to "that Richard" is vague. The comment was an isolated instance of conduct engaged in by a co-worker, and alone was not sufficiently severe to alter the conditions of Chylinski's employment.[8]

Bingham's overheard telephone conversations with friends referencing "Richard" are similarly vague, and were not directed

---

department, he advised Spicer and Leonard. [Chylinski Depo. Tr. at 118; Leonard Aff. ¶14].  Leonard notified Chylinski that he would speak with Bingham and advise her to refrain from going near Chylinski.  [Chylinski Depo Tr. at 118].  Leonard spoke with Bingham who stated that visits to Spicer's department were due to a job related necessity. [Leonard Aff. ¶14].

[8]See, e.g., Alfano, 294 F.3d at 380 (finding the alleged conduct non-actionable when the incidents were "too few, too separate in time, and too mild ... to create an abusive working environment"); Eldaghar v. City of New York Dep't of Citywide Admin. Servs., No. 02 Civ. 9151, 2008 WL 2971467, at *14-17 (S.D.N.Y. July 31, 2008) (granting defendant's motion for summary judgment on plaintiff's hostile work environment claims based on six alleged derogatory comments and other alleged discriminatory conduct); Adam v. Glen Cove Sch., No. 06 Civ. 1200, 2008 WL 508689, at *11 (E.D.N.Y. Feb. 21, 2008) (finding two alleged uses of the "N word" insufficient to sustain a claim for a hostile work environment); Trinidad v. New York City Dep't of Corr., 423 F. Supp. 2d 151, 167-68 (S.D.N.Y. 2006) (finding isolated incidents of defendant calling plaintiff a bitch and making sexual remarks over the course of five and one-half years of employment insufficient to support a hostile work environment claim).

to Chylinski. Chylinski made his initial complaint to management on Thursday, December 8, 2005. After he moved his workstation to Spicer's department on Monday, December 12, 2005, Chylinski admitted that he did not have any further communications with Bingham. An examination of the totality of the circumstances does not support plaintiff's hostile work environment claim.  None of the incidents was clearly directed at Richard Chylinski and in the aggregate they were not sufficiently severe or pervasive to be considered continuous and concerted.  See Alfano, 294 F.3d at 374. ("incidents must be more than episodic").

    "In short, a plaintiff alleging a hostile work environment must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were 'sufficiently continuous and concerted' to have altered the conditions of her working environment." Id. (internal quotation marks and citations omitted). Compare Hayut v. State Univ. of New York, 352 F.3d 733, 746-47 (2d Cir. 2003) (frequency of sexual comments transformed them into an actionable constitutional tort), Howley v. Town of Stratford, 217 F.3d 141, 154 (2d Cir. 2000) (obscene comments made at length, loudly, and in a large group could intolerably alter working conditions), and Whidbee v. Garzarelli Food Specialties, Inc., 223 F.3d 62, 70-71 (2d Cir. 2000) (a "stream of racially offensive comments over the span of two to three months" constituted a race-based hostile work environment), with Sardina v. United Parcel Serv., Inc., 254 Fed. Appx. 108, 110 (2d Cir. 2007) (a few off-color and sexually

19

suggestive comments did not create a hostile work environment),
Guerrero v. Lowe's Home Ctrs., Inc., No. 06-5894-cv, 2007 WL
4009704, at *1 (2d Cir. Nov. 16, 2007) (only a few occasions of
offensive name-calling over three months, without physical
touching, threats,  interference with her work performance, or
overt sexual advances, not hostile work environment), and Cruz v.
Coach Stores, Inc., 202 F.3d 560, 571 (2d Cir. 2000) ("physically
threatening nature" of behavior brought repeated remarks "over
the line separating merely offensive or boorish conduct from
actionable sexual harassment.").  Plaintiff has not met this
threshold.[9]


Employer Liability

    Even assuming Bingham's remarks created a hostile work
environment, "plaintiff must show that a specific basis exists
for imputing the conduct that created the hostile work
environment to the employer."  Howley v. Town of Stamford, 217
F.3d 141, 154 (2d Cir. 2000) (citations and internal quotation
marks omitted).  "When the source of the alleged harassment is a
co-worker, the plaintiff must demonstrate that the employer
failed to provide a reasonable avenue for complaint or if it

_____

    [9]Defendant also argues that "plaintiff's own actions belie
his contention that he found Bingham's conduct subjectively
offensive or so abusive as to alter his work environment." [Doc.
#96 at 8].  The Court agrees.  On December 1, 2005, plaintiff
initiated contact with Bingham and asked her to speak with Mark
Leonard about moving his work station.  Plaintiff testified that
Bingham did not respond to his email. On December 8, 2005,
Chylinski emailed Bingham asking her availability to meet with
him and Leonard over lunch.

knew, or in the exercise of reasonable care should have known, about the harassment yet failed to take appropriate remedial action." Id. (citations and internal quotation marks omitted); Richardson v. New York State Dept. Of Correctional Service, 180 F.3d 426, 446 (2d Cir. 1999) ("[A]n employer will be liable in negligence for a racially or sexually hostile work environment created by a victim's co-workers if the employer knows about (or reasonably should know about) that harassment but fails to take appropriately remedial action.").

The record shows that the Bank took reasonable and timely steps to address Chylinski's complaints and acted promptly to investigate and eliminate the sexually charged behavior.[10] Plaintiff met with his supervisor, Leonard, and Bingham on December 8, 2009.  On December 9, Chylinski met with Leonard and Unit Leader Donna Spicer. Spicer advised Chylinski to prepare a letter specifically outlining his concerns so that management could address the matter appropriately. Later that day, Chylinski emailed Spicer and Leonard a list of allegations about Bingham. This was the first time defendant was made aware of Chylinski's specific allegations of sexual harassment by Bingham.  Leonard stated that upon receipt of the email, he contacted human resources and spoke with Beverly Haynes, Fulfillment Unit Leader.

---

[10]The parties dispute whether Chylinski stated at the December 8 meeting that Bingham was sexually harassing him. Rather, Leonard recalls that Chylinski complained about Bingham's space heater and requested that he or Bingham's work station be moved. Nevertheless, by December 9, Chylinski had memorialized his complaints in an email to Spicer and Leonard. [Chylinski Depo. Tr. Ex. 10].

On Monday, December 12, 2005, Chylinski met with Leonard, Spicer and Haynes,  to discuss Chylinski's allegations.  Chylinski repeated his request for a transfer and his workstation was moved to Spicer's department, away from Bingham. Chylinski's allegations were investigated and, despite a finding that plaintiff's allegations could not be corroborated, Bingham was verbally counseled on proper workplace behaviors.  Although Chylinski claims he continued to see Bingham in and around his new department, the encounters were episodic and Chylinski testified that all communications with Bingham stopped after December 12, 2005. Chylinski continued to perform the same responsibilities as a direct report to Leonard from a different location within the facility.

     Accordingly, the Court cannot find evidence to support the claim that plaintiff was subjected to a hostile work environment permeated with discriminatory intimidation sufficiently severe or pervasive to alter the condition of his employment, or that any specific basis exists for imputing to the employer the conduct that allegedly created the hostile environment. Briones v. Runyon, 101 F.3d 287, 291 (2d Cir. 1996).  Summary judgment is **GRANTED** in defendant's favor on plaintiff's hostile work environment claim.


Title VII: Retaliation

     Title VII prohibits retaliation against employees who initiate or participate in a proceeding or investigation that

22

claims their employer violated Title VII. 42 U.S.C. § 2000e-3(a).
Under the McDonnell Douglas burden-shifting framework, Chylinski
must first demonstrate a prima facie case of retaliation. See
Terry v. Ashcroft, 336 F.3d 128, 140-41 (2d Cir. 2003).

To establish a prima facie case of retaliation under Title
VII, a plaintiff is required to show by a preponderance of the
evidence that: (1) he participated in a protected activity, (2)
the defendant knew of the protected activity; (3) the employer
took an adverse employment action against plaintiff; and (4) a
causal connection exists between the protected activity and the
adverse employment action. Cifra v. Gen. Elec. Co., 252 F.3d 205,
216 (2d Cir. 2001) (citations omitted). Title VII's
"anti-retaliation provision protects an individual not from all
retaliation, but from retaliation that produces an injury or
harm." Burlington Northern & Santa Fe Ry. Co. v. White, 548 U.S.
53, 67, (2006). If a plaintiff meets his minimal prima facie
burden and the defendant counters with legitimate justifications
for its actions, then the plaintiff must show that the proffered
reasons are merely pretextual. Reed v. A.W. Lawrence & Co., 95
F.3d 1170, 1181 (2d Cir. 1996).

Defendant does not dispute that Chylinski has established
the first and second elements of a prima facie case of
retaliation. Plaintiff made a complaint of sexual harassment on
December 8, 2005, and defendant responded to the charges.   The
third element, "adverse employment action," is disputed.  This is
an objective standard: "a plaintiff must show that a reasonable

23

employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." <u>Burlington Northern</u>, 548 U.S. at 68 (citation and quotation marks omitted). In distinguishing "material adversity" from "trivial harms," the Supreme Court explained that, "[a]n employee's decision to report discriminatory behavior cannot immunize that employee from those petty slights or minor annoyances that often take place at work and that all employees experience." <u>Id.</u> (citation omitted).  "An adverse employment action is one which is more disruptive than a mere inconvenience or an alteration of job responsibilities." <u>Feingold v. New York</u>, 366 F.3d 138, 152 (2d Cir. 2004) (internal quotations and citations omitted)). "Examples of materially adverse employment actions include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation." <u>Id.</u> (internal quotations and citations omitted).

Defendant argues that plaintiff was transferred to another department after he repeatedly requested that he be moved.  There is no evidence that his title, pay, job responsibilities or benefits were changed in anyway and he continued to perform the same responsibilities and report to the same manager.  However, Chylinski maintains that the termination of his employment on May 26, 2006, more than five months later, was a retaliatory

discharge by his employer for reporting sexual harassment. There is no question that a termination of employment, by definition, may constitute an adverse employment action.

The Court finds, however, that Chylinski has not satisfied the fourth element, which requires him to demonstrate a causal connection between his protected activity and the adverse action. To establish the fourth element, Chylinski must put forth evidence of retaliatory animus or motive. "For purposes of establishing a prima facie case, Title VII of the 1964 Civil Rights Act is violated when a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause." Cosgrove v. Sears, Roebuck & Co., 9 F.3d 1033, 1039 (2d Cir. 1993) (citations omitted).

Chylinski offered no evidence that the termination of his employment was linked to his December 2005, discrimination complaint.  "[P]roof of causation can be shown either: (1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant." Gordon v. New York City Bd. of Educ., 232 F.3d 111, 117 (2d Cir. 2000) (citing Cosgrove, 9 F.3d at 1039). As to the indirect method of proving causation, there is no temporal link here. Chylinski complained of sexual harassment on December 8, 2005. His work station was relocated at

his request on December 12, 2005.  His request for relocation occurred nearly six months before the Bank terminated his employment on May 26, 2209.  Chylinski has not pointed to any incidence of protected activity that is temporally proximate to the termination of his employment. Nor is there any evidence in the record regarding disparate treatment of fellow employees who engaged in similar conduct.

As to the direct method of proving causation, Chylinski has not offered any evidence of retaliatory animus on the part of the Bank. Plaintiff has not set forth any facts that would support a conclusion that the progressive discipline he received for failure to use the proper reporting channels and/or failure to arrive to work on time, or his termination for insubordination, were motivated by retaliatory animus.

Even assuming that Chylinski made out a prima facie case of retaliation, the Bank has articulated legitimate reasons for its actions and Chylinski has not offered any evidence that the proffered reasons were pretextual.

Once the plaintiff has presented a prima facie case of discrimination, the defendant has the burden of producing, "through the introduction of admissible evidence, reasons for its actions which, if believed by the trier of fact, would support a finding that unlawful discrimination was not the cause of the employment action." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507 (1993) (internal quotation marks and citation omitted, emphasis in original). The Defendant's burden at this stage is

"one of production, not persuasion; it 'can involve no
credibility assessment,'" <u>Reeves v. Sanderson Plumbing Products,
Inc.</u>, 530 U.S. 133, 142 (2000) (quoting <u>St. Mary's Honor Center
v. Hicks</u>, 509 U.S. 502, 509 (1993)).  "After the defendant has
articulated such nondiscriminatory reasons, plaintiff has an
opportunity to show that the reason was merely a pretext for
discrimination.  Pretext may be demonstrated either by the
presentation of additional evidence showing that 'the employer's
proffered explanation is unworthy of credence,'... or by reliance
on the evidence comprising the prima facie case, without more . .
. ." <u>Chambers v. TRM Copy Centers Corp.</u>, 43 F.3d 29, 38 (2d Cir.
1994) (quoting <u>Burdine</u>, 450 U.S. 248, 256 (1981)).

It is undisputed that Chylinski was counseled from December
2005 through his termination to refrain from speaking to
associates or managers outside his department about personnel
issues that should be addressed to his direct report manager or
human resources. Findings of Fact ¶¶20-26.  Chylinski ignored
repeated instructions from his supervisor Leonard and spoke to
administrative assistants, managers of other departments and
various subcontractors of the Bank about his issues.  <u>Id.</u>
Chylinski's failure to follow instructions is well documented in
email correspondence contained in the record.[11]  It is also well

---

[11]For example, Chylinski received final written counseling
for tardiness on May 24, 2006, which stated that although he
received verbal counseling on March 24, 2006 and April 14, 2006,
regarding attendance/tardiness, since that time Chylinski had
been late an additional five times "even though [his] work
schedule was adjusted from 8:30am-5:00pm to 9:00am-5:30pm."
Chylinski was tardy on ten occasions from January 1 to May 24,

documented that Leonard tried to work with Chylinski to improve
his performance and his tardiness and to accommodate his repeated
requests to transfer his work station.  Chylinski received final
written counseling for inappropriate communication/behavior on
May 24, 2006, which referenced his verbal counseling regarding
inappropriate communication/behavior on December 7, 2005; May 11,
2006; and May 19, 2006, and stated that he continued to "exhibit
communication/behavior that is considered inappropriate in the
workplace.  Your inappropriate communication/behavior includes:
unprofessional communications/behavior with management;
unprofessional dialogue with colleagues; unprofessional dialogue
with contractor; disrupting the workplace." [Chylinski Depo. Tr.
Ex. 22].  The notice added, "You are expected to demonstrate
immediate and sustained improvement in the areas specifically
addressed concerning your behavior, and to comply with the
policies, procedures, guidelines and conditions of employment set
forth above. Failure to meet expectations may result in further
disciplinary action up to and including termination."  Id.

On May 24, 2006, just after receiving this final written
warning for inappropriate communications/behavior with management
and colleagues, Chylinski sent a cryptic email to Theresa
DeAngelo asking her to arrange a meeting with him, Haynes and
Spagna.[12] [Chylinski Depo. Tr. Ex. 23].   One hour later,

---

2006. [Chylinski Depo. Tr. Ex. 21].

[12]The email states,

During our meeting today with TL Mark Leonard and

28

Chylinski send a second email to Spicer with a copy to Haynes.[13] [Chylinski Depo. Tr. Ex. 24].  After consulting with human resources, Leonard terminated Chylinski's employment for insubordination, that is, sending emails to two managers outside his reporting structure after being given a final written warning.

The Bank has offered legitimate, nonretaliatory reasons for terminating Chylinski's employment and Chylinski has failed to counter with any evidence showing that the Bank's justifications were merely a pretext for unlawful retaliation.

Accordingly, summary judgment is **GRANTED** to defendant on plaintiff's retaliation claim.

---

myself.  I would like for you to arrange a meeting with myself and Beverly as well as Karen Spagna.  As soon as you know when I can be contacted please let me know.

Any questions or suggestions please see me directly.

[Chylinski Depo. Tr. Ex. 23].

[13] The second email states,

As we discussed this issue with TL Mark Leonard and myself.

**I would like your response to the question in order to clarify this issue.**

PLEASE SEE A MEMBER OF MANAGEMENT TO ADDRESS THIS ISSUE/OR MYSELF.

Any suggestions/questions?

[Chylinski Depo. Tr. Ex. 24 (emphasis in original)].

CONCLUSION

For the foregoing reasons, defendant's Motion for Summary Judgment **[Doc. #96]** is **GRANTED** on both remaining counts, One and Two.

Defendant's Motion to Dismiss for Failure to Prosecute and for Failure to Comply with Court Order **[Doc. #84]** is **DENIED** as moot in light of the entry of summary judgment.

Defendant's Motion to Strike **[Doc. #126]** is **DENIED** in light of the entry of summary judgment.

Defendant's Motion to Strike **[Doc. #132]** is **DENIED** in light of the entry of summary judgment.

Any objections to this recommended ruling must be filed with the Clerk of the Court within ten (10) days of the receipt of this order. Failure to object within ten (10) days may preclude appellate review. See 28 U.S.C. § 636(b)(1); Rules 72, 6(a) and 6(e) of the Federal Rules of Civil Procedure; Rule 72.2 of the Local Rules for United States Magistrates; Small v. Secretary of H.H.S., 892 F.2d 15 (2d Cir. 1989)(per curiam); F.D.I.C. v. Hillcrest Assoc., 66 F.3d 566, 569 (2d Cir. 1995).

SO ORDERED at Bridgeport this 18th day of February 2010.

_____/s/_____
HOLLY B. FITZSIMMONS
UNITED STATES MAGISTRATE JUDGE